# ILLINOIS OFFICIAL REPORTS

## Supreme Court

***People v. Rivera*, 2013 IL 112467**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOSE RIVERA, Appellee. |
| Docket No. | 112467 |
| Filed | February 22, 2013 |
| Rehearing denied | March 25, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where there was unobjected-to testimony that a sex-offense suspect told custodial interrogators that he wanted guarantees and probation and did not want to go to jail, but was told he could not be offered any guarantees, and where the prosecution argued that these statements were inculpatory as admissions of guilt, a claim of plain error in the admission of plea-related statements was rejected where there was no showing of his intent to plead guilty in exchange for anything. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Lawrence W. Terrell, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Cause remanded. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Donna Hickstein-Foley, of Foley & Foley, of Chicago, for appellee.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1       Following a jury trial in the circuit court of Cook County, defendant Jose Rivera was convicted of three counts of predatory criminal sexual assault, three counts of criminal sexual assault, five counts of aggravated criminal sexual abuse, and one count of possession of child pornography. The appellate court reversed defendant's convictions and remanded for a new trial based on the improper admittance of plea-related statements at trial. 409 Ill. App. 3d 122. On appeal to this court, the State argues that defendant's custodial statements were not plea related and, thus, were admissible. Defendant argues that we should affirm the appellate court's judgment. In the alternative, he cross-appeals, arguing that the trial court improperly disqualified his defense counsel. For reasons that follow, we hold that the trial court did not err in admitting defendant's statements because they were not plea-related discussions. We also reject defendant's claim in his cross-appeal. Accordingly, we reverse the appellate court's judgment and remand to the appellate court to address the remaining issues raised by defendant.

¶ 2                                            BACKGROUND

¶ 3       At trial, the State presented testimony that defendant repeatedly sexually assaulted and sexually abused his stepdaughter, J.M., beginning when J.M. was 11 years old, and continuing until J.M. was 14 years old. The State also introduced testimony that defendant sexually abused J.M.'s friend, 13-year-old J.T. The appellate court opinion describes in detail the evidence introduced at trial. For purposes of this appeal, we will set forth only those facts which are necessary to resolve the issues raised by the parties.

¶ 4       Defendant filed a written pretrial motion to suppress certain statements made to a police officer and an assistant State's Attorney after he was in custody but before any charges had been filed against him. Prior to the suppression hearing, the State moved to disqualify defendant's counsel, Michael Clancy, who was listed as a witness in defendant's motion to suppress. Attorney Michael Goggin appeared on defendant's behalf at the suppression hearing. The trial court granted the motion to disqualify Clancy as defendant's attorney of

record, finding that the written motion to suppress rendered Clancy a material witness. The court ordered Goggin to substitute on the motion to suppress.

¶ 5      Clancy testified at the suppression hearing as defendant's only witness. He testified that he went to the police station twice to meet with defendant, and that defendant signed a form prepared by Clancy which stated defendant was asserting his right to remain silent. The State presented testimony that defendant waived his rights prior to the two interviews in which defendant made statements. Following the hearing, the trial court denied the motion to suppress, finding that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to making the statements. The defense subsequently filed a motion to reconsider the court's disqualification of Clancy, which the court denied.

¶ 6      At trial, Franklin Park Police Detective Michael Jones testified that defendant was taken into custody at the police department on October 22, 2004. At 6:06 p.m., Detective Jones read defendant his *Miranda* rights in an interview room, and defendant agreed to speak with him. Detective Jones stated that he was in and out of the room as the investigation was ongoing. On October 23, at 2:04 a.m., Detective Jones went back into the interview room with defendant. Only the two of them were present. Detective Jones testified that the following conversation occurred:

> "Q. What did you say to him?
>
> A. I told him that his troubles had just gotten bigger. That not only was there one victim that we knew about[,] his stepdaughter that he had been having sex with, now we knew there was a girlfriend of hers, [J.T.], that he also had been having sex with.
>
> * * *
>
> Q. After you said this to the defendant, what if anything did the defendant do or say?
>
> A. He asked me if he gave a confession what guarantees would he have and I told him that he could have no guarantees whatsoever. I couldn't promise him anything.
>
> With that he said, I will tell you what. I will give you a confession. Just go get me another glass of water. With that I left the room."

After Detective Jones left the room to get defendant a glass of water, the conversation with defendant was terminated.

¶ 7      Detective Jones testified that, later the same day, at approximately 9:14 p.m., he had another conversation with defendant, along with Assistant State's Attorney Brad Giglio.[1] Detective Jones again read defendant his *Miranda* rights. Defendant waived his rights and agreed to speak with them. Detective Jones testified to the following conversation:

---

[1] It was established at the suppression hearing that defendant requested to speak with Detective Jones.

"Q. Now, after the defendant agreed to speak with you and the assistant state's attorney in the interview room, what if anything did the defendant say to the two of you?

A. He wanted to know that he had guarantees that he was not going to jail if he spoke to us.

Q. What did the assistant state's attorney say about that?

A. Told him that he could not be given any guarantees.

Q. And when he was told by the assistant state's attorney that he would not be given any guarantees, what did the defendant say at that point?

A. He said he was torn. That he wanted to do the right thing but that he was scared that he was going to go to jail.

Q. And did you or the—excuse me.

Did you or the assistant state's attorney indicate to him that you could not offer guarantees to him?

A. That's correct.

Q. At that time was the interview terminated?

A. Yes."

¶ 8        Giglio testified that in October 2004, he was an assistant State's Attorney assigned to the child exploitation unit of the sex crimes division. He testified that he and Jones met with defendant on October 23 at approximately 9 p.m. Giglio identified himself to defendant as an assistant State's Attorney and told him that he was a prosecutor and not defendant's lawyer. Defendant read and signed a form waiving his *Miranda* rights and agreed to speak with them. Giglio testified that the following conversation occurred:

"Q. All right.

And after you got that established, what did the defendant say to you?

A. He said he wanted to talk about what happened. That he wanted guarantees from us.

Q. Did he tell you what kind of guarantees he wanted from you and Investigator Jones?

A. Yes. He was adamant about not wanting to do any jail, about wanting to get probation. He said he would talk to us about what we were there to talk to him about if he had those guarantees. I told him that I couldn't give him that guarantee. I tried to find out basically what he wanted to talk about specifically, and I told him that I had talked with [J.M.] and that she had told me what happened.

I told him that I had talked with [J.T.] and she had told me what happened and

-4-

I asked him to tell me about that. He is like, well, I will talk to you about it. I don't want to go to jail. I don't want to go to jail.

I said, well, if you don't want to tell me about that, then just tell me where the hard drive is. He said, I want a guarantee. I told him, I can't give you a guarantee.

Q. Did you tell him why you couldn't give him a guarantee?

A. Yes.

I told him I wanted to hear what he had to say specifically. I told him that I don't want to give him a guarantee so that his—what he tells me is only because he is getting this guarantee. Like I don't want it to be coerced. I don't want it to be presented at a trial that he was promised this and that's the only reason he said X, Y, Z.

I did tell him that I spoke with both of the girls separately. That they told me that he had done the same things. I said, you know, to try and get him to tell me. And he said, I want a guarantee. I want probation. I don't want jail.

\* \* \*

Q. Well, was there a reason in terms of your job description or your employment why you could not give a guarantee or make deals with the defendant?

A. Well, I don't want whatever statement that I get from him to be useless if it is not freely given, if it is not something that he is choosing to give me, you know, outside of any coercion on my part.

I took my job very seriously. Obviously from my previous jobs, it is pretty clear that, I mean, I am a straight arrow. I do things, you know to the best of my ability by the book and I wanted to make sure that any statement that he gave to me was—would be admissible, would not be tainted, would be, you know, something that he chose to give.

\* \* \*

Q. And did he make any statement pertaining to—did he say anything else regarding the situation of the case only?

A. No.

At a certain point he terminated the dialogue."

Defendant did not object to any of the aforementioned testimony given by Jones and Giglio on the basis that the statements were part of a plea-related discussion.

¶9     Defendant testified on his own behalf. Defendant denied that any sexual activities, sexual assault, or sexual abuse occurred with J.M. or J.T. He denied making any statements to Detective Jones or Assistant State's Attorney Giglio and further denied that he had ever met Giglio.

¶ 10    The State made several references to defendant's custodial statements during opening statements and closing arguments. In its opening statement, the State told the jury:

> "And, eventually, you will learn that [defendant] made some statements to the police, and was trying to broker a deal with the police in exchange for telling them what really happened during 2002 to 2004."

During closing arguments, the State argued:

> "Detective Sergeant Jones testified that the defendant said if he gave a confession, what guarantees did he have? If he gave a confession, what guarantees? He was told none. He also told Detective Jones that he wanted to give a statement but he really wanted those guarantees ***. What did the defendant tell ASA Giglio? The defendant wanted a guarantee he was not going to jail. He wanted probation."

In its rebuttal argument, the State argued:

> "And finally after [J.T.] was contacted, Investigator Jones said, Well, I think your problems have just gotten a little bit more complicated. Do you know a girl named [J.T.]? You know what? Here's what he says: If I give you a confession, what guarantees do I have? I will give you a confession, but first I want a glass of water. That's inculpatory. That's an admission.

> Of course, the defendant denies that. He won't even admit that he met Brad Giglio before, never saw him, never heard about him, even though their signatures are right next to each other, never saw him, never heard from him. Is Brad Giglio lying too? Brad talked to him. He said, I want you to give me some guarantees. I'll tell you, I feel bad, I feel bad. I want to do the right thing, but I'm scared and I don't want to go to jail. Brad said, you know, we can't give you any guarantees. That's not how we operate. Those are admissions. Admissions of guilt."

¶ 11    At the close of the evidence and arguments, the jury convicted defendant of three counts of predatory criminal sexual assault, three counts of criminal sexual assault, five counts of aggravated criminal sexual abuse, and one count of possession of child pornography. Defendant was sentenced by the trial court to 75 years' imprisonment.

¶ 12    Defendant raised a number of issues on appeal, including that statements made by defendant while in custody were inadmissible plea-related discussions, in violation of Illinois Supreme Court Rule 402(f) (Ill. S. Ct. R. 402(f) (eff. July 1, 1997)). The appellate court reversed defendant's convictions and remanded for a new trial based upon the improper admittance of plea-related statements at trial. 409 Ill. App. 3d at 136-37. The court found that the trial court's admission of the plea-related statements was plain error under the second prong of the plain-error doctrine based on the "potentially devastating effect" of the evidence. *Id.* at 136. Of the remaining issues raised by defendant, the court commented upon several issues which might occur upon retrial and declined to address other issues which the court found would be moot upon retrial. One of the issues commented upon was whether the trial court improperly disqualified defendant's originally retained counsel, Michael Clancy,

from representing defendant. *Id.* at 142-43. The court found that the trial court did not abuse its discretion in disqualifying Clancy on the basis that the State might call Clancy as a witness at trial, thus creating a serious potential for a conflict of interest. *Id.*

¶ 13    We allowed the State's appeal pursuant to Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)).

¶ 14                                      ANALYSIS

¶ 15                            I. Plea-Related Discussion

¶ 16    Supreme Court Rule 402(f) provides:

> "If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." Ill. S. Ct. R. 402(f) (eff. July 1, 1997).

¶ 17    At issue is whether defendant's custodial statements introduced at trial were part of "plea discussions," within the meaning of Rule 402(f). If so, the statements were improperly admitted into evidence, and the jury should not have been allowed to consider them. Defendant failed to object to the testimony at trial or include the issue in his written posttrial motion. Accordingly, defendant has procedurally defaulted the alleged error in admitting the testimony unless we conclude that plain error affecting a substantial right has occurred. See *People v. Williams*, 193 Ill. 2d 1, 26-27 (2000); Ill. S. Ct. R. 615(a). In order to obtain relief, defendant must establish that a clear or obvious error occurred. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). For the following reasons, we hold that there was no clear or obvious error in allowing the testimony regarding defendant's custodial statements. Moreover, because the statements were not made as part of a plea discussion pursuant to Rule 402(f), they were admissible as evidence of defendant's independent admissions.

¶ 18    The purpose of Rule 402(f) is "to encourage the negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussion at his peril." *People v. Friedman*, 79 Ill. 2d 341, 351 (1980). This court has adopted a two-part test for determining whether a particular statement is plea related, with both a subjective and an objective component. We consider, "first, whether the accused exhibited a subjective expectation to negotiate a plea, and, second, whether this expectation was reasonable under the totality of the objective circumstances." *Id.* (citing *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978) (establishing test under the then-existing federal rules)).

¶ 19    Not all statements made by a defendant in the hope of obtaining concessions are plea discussions. *People v. Jones*, 219 Ill. 2d 1, 28 (2006); *People v. Rolih*, 233 Ill. App. 3d 484, 488 (1992); *People v. Victory*, 94 Ill. App. 3d 719, 722 (1981). There is a difference between a statement made in the course of a plea discussion and an otherwise independent admission, which is not excluded by Rule 402(f). *Friedman*, 79 Ill. 2d at 353. The determination is not

a bright-line rule and turns on the factual circumstances of each case. *Id.* at 352. In making this determination, we may consider the nature of the statements, to whom defendant made the statements, and what the parties to the conversation said. *Jones*, 219 Ill. 2d at 27-28. "Before a discussion can be characterized as plea related, it must contain the rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State." *Friedman*, 79 Ill. 2d at 353. Where a defendant's subjective expectations to engage in plea negotiations are not explicit, the objective circumstances surrounding the statement take precedence in evaluating whether the statement was plea related. *Id.*

¶ 20      The record in this case shows that defendant made statements on two separate occasions during his time in police custody but before any charges had actually been filed against him. "The examination of whether statements are plea-related is fact specific. A finding as to one statement does not necessarily reflect upon the admissibility of other statements." *Jones*, 219 Ill. 2d at 22 (citing *Friedman*, 79 Ill. 2d 341, 352 (1980)). Accordingly, we look at each set of statements separately to determine whether the statements were made in the course of a plea discussion.

¶ 21      At approximately 2 a.m. on October 23, defendant had a conversation with Detective Jones in the interview room at the police station. Defendant asked Detective Jones, "if he gave a confession what guarantees would he have." Jones responded that, "he could have no guarantees whatsoever. I couldn't promise him anything." Defendant then said, "I will tell you what. I will give you a confession. Just go get me another glass of water."

¶ 22      This first set of statements does not show a subjective intention by defendant to negotiate a plea. Defendant failed to specify what "guarantees" he was seeking from Detective Jones in exchange for confessing. Nor did he explain what his "confession" would entail. Defendant never asked to speak with a prosecutor. His second statement that he would confess if Detective Jones brought him another glass of water negates any suggestion that defendant might have been offering to plead guilty in exchange for concessions by the State. We cannot say that defendant manifested a subjective intent to initiate a plea discussion where defendant never specified the terms of his alleged offer to plea bargain.

¶ 23      In this regard, this case is similar to *People v. Hart*, 214 Ill. 2d 490 (2005). There, the defendant was interviewed by a police detective at the jail, who told the defendant that he was there to interview the defendant about an armed robbery, and that he knew defendant was involved. The defendant did not deny being involved but asked the detective what he " 'could do for him if he cooperated.' " *Id.* at 495. The detective told the defendant that he could not make any promises to him if he cooperated, but that he would contact the State's Attorney's office and advise them of his cooperation. *Id.* We held that Rule 402(f) was not intended to exclude as evidence mere offers to cooperate with the police, at least where the offers were not accompanied by " 'the rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State.' " *Hart*, 214 Ill. 2d at 504 (quoting *Friedman*, 79 Ill. 2d at 353). We noted that the defendant never asked what concessions the prosecutor might offer him, did not ask the detective to

contact the State's Attorney's office or to convey terms to the prosecutor, nor did he specify what his "cooperation" would entail or what, if anything, he would require in exchange for his cooperation. *Id.* at 511. Finally, the defendant never said that he was willing to plead guilty or discuss pleading guilty. *Id.*

¶ 24    In contrast to the defendant in *Hart*, the defendants in *Friedman* and *People v. Hill*, 78 Ill. 2d 465 (1980), clearly expressed their subjective expectations to engage in plea discussions. In *Friedman*, approximately one month after his indictment for theft by deception and conspiracy, the defendant called an investigator at the Attorney General's office and inquired about "making a deal." The defendant then stated, "If I'm convicted, I would rather go to a Federal prison as opposed to a State prison," in reference to the defendant's indictment for a federal offense arising out of the same series of transactions. The investigator informed the defendant that he had no control over that and to " 'talk to Mr. Rosenberg.' " *Friedman*, 79 Ill. 2d at 350. This court held that the defendant's statement was improperly admitted at trial because it was a plea-related discussion and therefore inadmissible under Rule 402(f). *Id.* at 352. We found that the defendant's "unsolicited statement was an offer to enter negotiation, stating generally the terms upon which defendant would be willing to bargain," and that the defendant's inquiry about "making a deal" prior to the statement was "a clear indication of defendant's intent to pursue plea negotiations." *Id.*

¶ 25    In *Hill*, after confessing to one of two murders, the defendant asked to see " 'the honcho, the head man.' " Assistant State's Attorney Joseph Urso told the defendant that he " 'guessed I was the honcho because I determined what he was going to be charged with.' " *Hill*, 78 Ill. 2d at 469-70. The defendant then said, " ' "I want to talk a deal." ' " *Id.* at 470. Urso said, " ' "Deal? I guess I could talk a deal with you, but the only person who could approve a deal would be the State's Attorney himself, Bernard Carey, but I can talk to you." ' " *Id.* The defendant then told Urso that " 'he would confess to both murders, give a statement confessing to both murders, plead guilty to both murders and testify against Dr. Kaye, the person who paid him to kill Mr. Fields, if I could get him a signed affidavit from Mr. Carey that [he] would be sentenced to the minimum 14 years.' " *Id.* The admission of the testimony was held to be erroneous and so prejudicial as to require reversal. *Hill*, 78 Ill. 2d at 474.

¶ 26    Unlike the defendants in *Friedman* and *Hill*, defendant did not exhibit a subjective expectation to negotiate a plea. Defendant did not ask for any specific concessions from the State, only for unspecified "guarantees." Nor did defendant actually offer to plead guilty. Because defendant had not yet been charged when he made the statements, it is not apparent what concessions defendant hoped to receive in exchange for his confession. Not all statements made in the hopes of some concession are plea related. See, *e.g.*, *People v. Rolih*, 233 Ill. App. 3d 484, 486, 489 (1992) (where defendant told a State Police investigator that " 'he wished to cooperate in any way possible for future consideration of the charges that would be pending against him,' " the rudiments of a negotiated plea were lacking, in that defendant did not indicate the terms under which he would be willing to bargain); *People v. Hanks*, 174 Ill. App. 3d 555, 560 (1988) (defendant's offer to confess in exchange for a notice to appear was not a plea discussion where such notice would not affect the disposition

of the case); *People v. Tennin*, 123 Ill. App. 3d 894, 898 (1984) (a defendant's willingness to "make a 'deal' " is not plea related where defendant is negotiating for a release without bond, or for the dropping of charges against him in return for information).

¶ 27    Even if defendant exhibited a clear subjective expectation to plea bargain, such an expectation was not reasonable under the totality of the objective circumstances. Detective Jones told defendant that he could not offer him any guarantees. Despite the unequivocal refusal by Detective Jones, defendant proceeded to state that he would confess if Jones brought him a glass of water. In effect, defendant offered to confess without attaching any conditions to his offer or asking for any concessions by the State. Thus, the "rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State," were absent. See *Friedman*, 79 Ill. 2d at 353. Under these circumstances, defendant's statements did not constitute plea discussions under Rule 402(f).

¶ 28    Turning to the second set of statements made by defendant, at approximately 9 p.m. on October 23, defendant met with Detective Jones and Assistant State's Attorney Giglio. Jones testified that defendant "wanted to know that he had guarantees that he was not going to jail if he spoke to us." After Giglio told defendant that he could not give him any guarantees, according to Jones, defendant then said that "he was torn. That he wanted to do the right thing but that he was scared that he was going to go to jail." Giglio testified that defendant "said he wanted to talk about what happened" and that "he wanted guarantees from us." He testified that defendant was "adamant" about not wanting to go to jail and wanting probation, and that defendant "said he would talk to us about what we were there to talk to him about if he had those guarantees." Giglio told defendant several times that he could not give him any guarantees. Defendant said, "I will talk to you about it. I don't want to go to jail. I don't want to go to jail." Giglio explained to defendant that he could not offer him anything in exchange for his statement because he did not want any statement by defendant to be coerced. Defendant then ended the conversation.

¶ 29    Like the first conversation, this second conversation did not exhibit a subjective intention by defendant to enter into plea negotiations. Defendant did not offer to plead guilty or even to confess. Rather, he said that he would "talk about what happened" and that he would talk to them "about what [they] were there to talk to him about." Defendant also stated that he wanted to "do the right thing." There is no way to know from these statements exactly what defendant meant to tell Jones and Giglio. Defendant may have intended not to confess, but to exonerate himself or otherwise distance himself from the allegations made by the victims. The record does not reveal what defendant was told about those allegations at the time of his conversation with police. In his trial testimony, however, defendant specifically denied the acts which were testified to by J.M. and J.T., as well as denying that he made any statements to Jones and Giglio. Finally, defendant never specified what his "doing the right thing" would entail, nor did he state or even hint that he was willing to plead guilty. In *Jones*, we noted the distinction between a statement made in furtherance of a plea negotiation and an independent admission, which is admissible in evidence:

     " 'Every guilty person who voluntarily speaks to a detective probably hopes

to benefit from the conversation, either by convincing the detective that he did not commit the crime or by obtaining leniency for his cooperation. We should resist an approach that characterizes every conversation between a defendant and a detective as a plea negotiation. The police have an investigatory function that the courts and even the State's Attorney do not have.' [Citation.]

This investigatory function is critical to law enforcement, and we must be careful to recognize this distinction when interpreting whether Rule 402(f) applies. Particularly, while Rule 402(f) was enacted to encourage the negotiation process, it was not enacted to discourage legitimate interrogation techniques. Those arrested often seek leniency, and not all attendant statements made in the hope of gaining concessions are plea-related statements under Rule 402(f)." *Jones*, 219 Ill. 2d at 28 (quoting *People v. Jones*, 315 Ill. App. 3d 500, 506 (2000), *rev'd on other grounds*, 197 Ill. 2d 346 (2001)).

¶ 30    We find that defendant's statements are not accurately characterized as an attempt to engage in plea negotiations. As such, the statements were independent admissions which were fully admissible at trial. While we do not require a " 'preamble explicitly demarcating the beginning of plea discussions,' " it must be clear that a defendant actually intends to plead guilty in exchange for a concession by the State, and that such intention is objectively reasonable under the circumstances. *Friedman*, 79 Ill. 2d at 352 (quoting *United States v. Herman*, 544 F.2d 791, 797 (5th Cir. 1977)). Defendant's intent to engage in plea negotiations was not shown where it was not evident that he was actually offering to plead guilty to any crimes.

¶ 31    Furthermore, defendant was informed several times that he would not be offered anything in exchange for his statements. The repeated disclaimers by Jones and Giglio that they could not offer defendant any guarantees erode the reasonableness of any belief by defendant that the parties were engaged in plea-bargain discussions. See *Robertson*, 582 F.2d at 1373 n.3 (Morgan, J., specially concurring, joined by Goldberg and Fay, JJ.). In sum, the record does not reveal that defendant believed he was negotiating a plea when he made the statements at issue, nor would such a belief have been reasonable under the circumstances. The statements were not made as part of a plea discussion, and, as such, were admissible. Accordingly, there was no clear or obvious error in allowing the testimony concerning defendant's custodial statements.

¶ 32                              II. Disqualification of Counsel

¶ 33    In his cross-appeal, defendant contends that the trial court abused its discretion when it granted the State's motion to disqualify his defense attorney, Michael Clancy, and when the court denied his subsequent motions to reconsider the issue. He asserts that the court's decision violates his constitutional right to counsel of choice.

¶ 34    Clancy was retained by defendant while defendant was in custody at the police department on October 22, 2004. On October 30, 2006, Clancy filed a motion to suppress

statements alleging that Clancy met with defendant at the police station; that defendant, in the presence of Clancy and Detective Jones, asserted his right to remain silent, asserted that he did not want to be questioned, and asserted that his attorney must be present during any questioning; that defendant signed a written assertion of his *Miranda* rights in the presence of Clancy and Jones; and that defendant was subsequently questioned and made statements in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).

¶ 35      On April 9, 2008, the State filed a written motion to disqualify Clancy from representing defendant in the case. The State alleged that Clancy was listed as a defense witness on defendant's motion to suppress statements and that Clancy was prohibited from both representing defendant and acting as a witness in the same proceeding. The State alleged further that there existed a possibility that Clancy may be a witness at trial. The hearing on the motion to suppress was held on July 24, 2008. Attorney Michael Goggin appeared, along with Clancy, on behalf of defendant. Prior to the suppression hearing, the trial court inquired whether Goggin had filed an appearance in the case and ordered him to do so. Goggin informed the court that he thought he had filed an appearance, and that he had been "retained in this case for quite a period of time."

¶ 36      With regard to the motion to disqualify, Goggin argued that Clancy should not be disqualified from representing defendant at trial because Clancy would not be called as a witness at trial. Goggin told the court that Clancy was not present at the police station when defendant made statements to police. The State argued that defendant made statements both before and after Clancy's arrival at the station, and that the circumstances surrounding those statements may require Clancy to testify. The court ruled that the written motion to suppress rendered Clancy a material witness. The court disqualified Clancy as attorney of record in the case and ordered Goggin to substitute as defense counsel. During the suppression hearing, Clancy testified as defendant's only witness. After the hearing, Goggin asked the court to reconsider Clancy's disqualification, but the court denied that request. The court further denied a subsequent written motion to reconsider filed by Goggin, finding it likely that the State could call Clancy as a witness "under a more credible factual scenario." Goggin continued to represent defendant at trial.

¶ 37      The sixth amendment guarantees a criminal defendant the right to assistance of counsel (U.S. Const., amend. VI), which encompasses the right to effective representation as well as the right to select and be represented by one's preferred attorney. *People v. Holmes*, 141 Ill. 2d 204, 217 (1990) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). The right to counsel of choice is not absolute and is circumscribed in several respects, which may include the disqualification of chosen counsel in the event of a conflict of interest. *Id.* "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. The trial court is in the best position to weigh and evaluate the facts and circumstances and the particular interests in each case to determine whether disqualification is warranted. *Holmes*, 141 Ill. 2d at 223. Accordingly, a reviewing court will not set aside a trial court's decision to disqualify a

defendant's chosen counsel unless there has been a clear abuse of discretion. *Id.* at 224. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. Ortega*, 209 Ill. 2d 354, 359 (2004) (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)).

¶ 38　　　The State alleged prior to the suppression hearing that Clancy had a conflict of interest in his role as an advocate for defendant, in that he intended to testify as a witness at the suppression hearing. The State also alleged that it was possible that Clancy would be called as a witness at trial. In this court, the State maintains that, pursuant to Rule 3.7 of the Illinois Rules of Professional Conduct, Clancy had a professional obligation to withdraw as defense counsel when he intended to testify as a material witness at the suppression hearing.

¶ 39　　　At the time of defendant's trial in 2009, Rule 3.7 provided in part:

"(a) A lawyer shall not accept or continue employment in contemplated or pending litigation if the lawyer knows or reasonably should know that the lawyer may be called as a witness on behalf of the client, except that the lawyer may undertake the employment and may testify:

(1) if the testimony will relate to an uncontested matter;

(2) if the testimony will relate to a matter of formality and the lawyer reasonably believes that no substantial evidence will be offered in opposition to the testimony;

(3) if the testimony will relate to the nature and value of legal services rendered in the case by the lawyer or the firm to the client; or

(4) as to any other matter, if refusal to accept or continue the employment would work a substantial hardship on the client." Ill. R. Prof. Conduct R. 3.7 (eff. Aug. 1, 1990).[2]

¶ 40　　　We agree with the State that in this case, where counsel acted as both an advocate and a witness in the course of pending litigation, Rule 3.7 required Clancy to withdraw from his representation of defendant, and we find, therefore, that the trial court did not abuse its discretion in disqualifying Clancy. The rule prohibiting counsel from acting as both an

---

[2]The former Rules of Professional Conduct were repealed in 2010 and replaced by a new set of rules. Rule 3.7 now states:
　　　"(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
　　　　(1) the testimony relates to an uncontested issue;
　　　　(2) the testimony relates to the nature and value of legal services rendered in the case; or
　　　　(3) disqualification of the lawyer would work substantial hardship on the client.
　　　(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9." Ill. R. Prof. Conduct (2010) R. 3.7 (eff. Jan. 1, 2010).

advocate and a witness in the same case reflects important policy considerations. For instance, the attorney-witness may not be a fully objective witness, causing harm to the client's cause, or the trier of fact may grant undue weight to the attorney's testimony, unfairly disadvantaging the opposing party. *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App. 3d 383, 395-96 (1991); *Jones v. City of Chicago*, 610 F. Supp. 350, 357 (D.C. Ill. 1984). Balanced against a defendant's sixth amendment right to counsel of choice, " 'courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession' and that 'their judgments remain intact on appeal.' " *People v. Barrow*, 133 Ill. 2d 226, 253 (1989) (quoting *Wheat*, 486 U.S. at 160-61).

¶ 41      *People v. Reed*, 298 Ill. App. 3d 285 (1998), is on point with the facts in this case. The defendant argued that he was deprived of his sixth amendment right to counsel when the trial court ordered his attorney, Jack Rogdon, to withdraw from the case prior to trial. *Id.* at 294. In the pretrial motion to suppress, Rogdon stated that the defendant had requested to speak with him during police questioning, that Rogdon was present at the police station during part of the interrogation, and that he was not permitted to see the defendant. The State made an oral motion to disqualify Rogdon because he was a potential witness at the hearing on the motion to suppress. The trial court agreed and ordered Rogdon to withdraw from the case. The appellate court affirmed, finding no abuse of discretion. *Id.* at 295-96. The court held, based on the pleadings and the parties' arguments, that Rogdon might be called as a witness by the State on the issue of whether the police refused to let him see the defendant. Under those circumstances, "Rule 3.7 mandated Rogdon's withdrawal, and in the face of his refusal to so withdraw, the trial court acted within its discretion when it ordered him off the case." *Id.* at 295.

¶ 42      Defendant distinguishes *Reed*, arguing that in this case, Clancy was not likely to be called as a witness at trial, and, in fact, did not testify at trial. According to defendant, Clancy could have offered no legally admissible testimony at trial because his testimony was concerned solely with whether defendant waived his *Miranda* rights prior to speaking with police. Defendant's argument ignores the fact that the trial court ruled on the motion for disqualification prior to the suppression hearing at which Clancy offered his testimony as a defense witness. We agree with the appellate court below that the fact that Clancy was not called by the State as a witness during trial is irrelevant to the trial court's decision to disqualify him prior to the suppression hearing. The record demonstrates that, at the time of the court's decision, Clancy knew he would be called as a witness on behalf of his client in the course of pending litigation. See Ill. R. Prof. Conduct R. 3.7(a) (eff. Aug. 1, 1990). Thus, we cannot say that the trial court abused its discretion in disqualifying Clancy at that time.

¶ 43                                                    CONCLUSION

¶ 44      For the foregoing reasons, the judgment of the appellate court is reversed, and the cause is remanded to the appellate court for resolution of the remaining issues raised by defendant.

¶ 45        Appellate court judgment reversed.

¶ 46        Cause remanded.